IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| McKEL E. MOCK, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Case No. 08-CV-769-JHP-PJC |
| PRINCIPAL LIFE INSURANCE COMPANY, | ) | |
| Defendants. | ) | |

## OPINION AND ORDER[1]

Before the Court in ERISA[2] are Plaintiff's Opening Brief,[3] Defendant Principal Life Insurance Company's Response in Support of Denial of Claim Under ERISA,[4] Plaintiff's Reply to Principal Life Insurance Company's Response in Support of Denial of Claim Under ERISA,[5] Brief of Defendant Principal Life Insurance Company in Support of Denial of Claim Under ERISA,[6] Plaintiff's Response to Principal Life Insurance Company's Brief in Support of Denial of Claim

---

[1]Page references to party briefs within this Opinion and Order use the CM/ECF file stamp pagination, rather than party pagination.

[2]The parties have stipulated "[t]his matter is governed by ERISA." *See* Joint status Report at 3, Docket No. 18.

[3]Docket No. 45.

[4]Docket No. 48.

[5]Docket No. 51.

[6]Docket No. 44.

Under ERISA,[7] and Defendant's Reply in Support of Claim Denial Under ERISA.[8] For the reasons cited below, Defendant Principal's determination of benefits regarding Plaintiff's claims is **AFFIRMED**.

## BACKGROUND

### A. Policy Coverage and Provisions

Plaintiff McKel E. Mock was insured as a dependent under a group policy (the Policy) issued by Defendant to her father's employer Gajeske, Inc. as part of an "employee welfare benefits plan" (the Plan) as defined by ERISA.[9] Defendant has been designated as the entity that evaluates claims under the policy and "has complete discretion to construe or interpret the provisions of the policy, to determine eligibility for benefits, and to determine the type and extent of benefits, if any, to be provided."[10]

Plaintiff first contends that Defendant's determination that Doctors Millet and Looney were Non-Network Providers was arbitrary and capricious. The Policy differentiates between those healthcare providers who are within the Plan's preferred provider organization (PPO) network and those providers outside the network (non-PPO).[11] The Policy defines "Preferred Provider/PPO Provider" as "[a] Hospital, Physician or other provider contracted with a preferred provider

---

[7]Docket No. 49.

[8]Docket No. 50.

[9]PLI/Mock 000038, 000535.

[10]*Id.* at 000352-353.

[11]*See id.* at 000342-344.

organization (PPO) network identified by [Principal Life] to this Group Policy."[12] The Policy defines a "Non-Preferred/Non-PPO Provider" as "[a] Hospital, Physician, or other provider not contracted with the preferred provider organization (PPO) network identified by [Principal Life] to this Group Policy."[13] The Policy details how this distinction impacts a Plan participant's choice of a healthcare provider:

> The Policyholder's participation in the PPO network does not mean that an insured person's choice of provider will be restricted. The insured person may seek needed medical care from any Hospital, Physician, or other provider of his or her choice. *However, in order to avoid higher charges and reduced benefit payment, the insured persons are urged to obtain such care from Preferred Providers whenever possible.*[14]

However, the policy also provides that:

> If Treatment or Service for a listed Covered Charge is not available through a Preferred Provider and you or your Dependent receive such Treatment or Service from a Non-Preferred Provider, that provider shall be reimbursed at the same rate as the Preferred Provider would have been reimbursed had you or your Dependent been treated by a Preferred Provider.[15]

Plaintiff next contends Defendant acted arbitrarily and capriciously in both its determination of "Prevailing Charges" for the services provided and its refusal to apply write-offs for charges above the prevailing rate to her "Out-of-Pocket Expense." In "Part IV - Benefits" the Policy provides how benefits are paid on care received from non-PPO providers:

> If medical care is received from Non-Preferred Providers, Comprehensive Medical benefits payable for medical care received each calendar year will be:
>
> 1. for Treatment or Service listed under Hospital Services, Physician

---

[12]*Id.* at 000344.

[13]*Id*. at 000342.

[14]*Id.* at 000344 (*emphasis added*).

[15]*Id.* at 000394.

3

> Hospital Services, and All Other Covered Services, 60% of each person's Covered Charges in excess of the applicable Deductible or Copay amount until the maximum Out-of-Pocket Expense limits are met; and
>
> 2. for Treatment or Service listed under Physician Office or Clinic Services, 70% of each person's Covered Charges in excess of the applicable Deductible or Copay amount until the maximum Out-of-Pocket Expense limits are met; and
>
> 3. 100% of Covered Charges in excess of
>
> — $10,000 of Out-of-Pocket Expenses for a Member or Dependent; or
>
> — $15,000 of Out-of-Pocket Expenses for all persons in the same family (a Member and his or her Dependents).[16]

Further, If an assistant is used during a surgical procedure, the Policy provides benefits for the assistant's services at a reduced rate, detailed as follows:

> Benefits will be payable for the services of an assistant to a surgeon if the skill level of a Medical Doctor or Doctor of Osteopathy would be required to assist the primary surgeon. Covered Charges for such services will be paid up to 20% of Prevailing Charges of the covered surgical procedure if the procedure is performed by a Physician or a Health Care Extender. In addition, the multiple surgical procedure percentiles, as described [above] will be applied.

Much of the instant dispute revolves around what is a "covered charge" under the Policy. The Policy explains that the "Covered Charges" referenced above will be "the actual cost charged to the Member or Dependant but only to the extent that the actual cost charged does not exceed Prevailing Charges."[17] The Policy defines those "Prevailing Charges" as follows:

> a. For medical care received from Preferred Providers, the negotiated fee between the Preferred Provider and the PPO.

---

[16]*Id.* at 00391-93.

[17]*Id.* at 000399.

> b. For medical care received from Non-Preferred Providers, the amount as determined by [Principal Life] that is derived from a cost-based methodology used by Medicare or a methodology similar to one used by Medicare.[18]

The Policy provides that the Copay for each hospital stay related to treatment by a Non-Preferred Provider is $500.00 and the deductible amount for care received from Non-Preferred Providers will be "$2,000 each calendar year for all other *Covered Charges* …."[19] Further charges used to satisfy the Preferred Provider deductible may not be used to satisfy the deductible requirement for care received from Non-Preferred Providers.[20]

The Policy explains that "Out-of-Pocket Expenses,"which are used to determine "Out-of-Pocket Maximum"amounts, are defined as "Covered Charges for Treatment and Service for which no benefits are payable because of Deductible, Copayment, and coinsurance features" and specifically provides that "Out-of-Pocket Expenses does [sic] not include charges that are in excess of Prevailing Charges or charges that are not Covered Charges under this Group Policy."[21] The Policy also provides that:

> Covered Charges will not include and no benefits will be paid for:
>
> > a. Treatment or Service that is not a Covered Charge; or
> >
> > ***
> >
> > c. Any part of a charge for Treatment or Service that exceeds
> > > Prevailing Charges; or
> >
> > ***
>
> > au. Charges that are billed incorrectly or separately for Treatment

---

[18]*Id.* at 000344-45.

[19]*Id.* at 000396 (*emphasis added*).

[20]*Id.*

[21]*Id.* at 000397.

or Services that are an integral part of another billed Treatment or
Service as determined by Us.[22]

Finally, Plaintiff contends Defendant's decision to treat Plaintiff's procedure as multiple surgical procedures, rather than a single procedure, was arbitrary and capricious. The Policy provides the following regarding multiple procedures:

Regarding multiple surgical procedures, the Policy provides:

> If You or one of your Dependents undergo two or more procedures during the same anesthesia period, Covered Charges for the services of a Physician, facility or other covered provider for each procedure that is clearly identified and defined as a separate procedure will be based on:
>
> 100% of Prevailing Charges for the first or primary procedure; and
>
> 50% of Prevailing Charges for the second procedure; and
>
> 25% of Prevailing Charges for each of the other procedures.[23]

## B. Administrative Adjudication of Plaintiff's Claim

The administrative record has been submitted to the Court and is Bate stamped PLI/Mock 000001-PLI/Mock 000772.[24] Plaintiff was initially treated by Dr. Jeff A. Fox in Tulsa, Oklahoma.[25] Concluding that Plaintiff needed surgery that was unavailable in Oklahoma, Dr. Fox referred Plaintiff to a surgeon in Colorado for the procedure.[26] On December 27, 2006, Plaintiff's mother called to notify Defendant of Plaintiff's impending "capsulalabral reconstruction for shoulder

---

[22] *Id.* at 432, 435.

[23] *Id.* at 000401.

[24] Docket No. 31-33, 43.

[25] Plaintiff's Opening Brief at 4, Docket No. 45.

[26] *See* Opinion and Order at 1-2, Docket No. 40.

instability." The call record reflects that "No" was marked next to "PPO" and states "did not show facility in-net either."[27] On January 3, 2007, Plaintiff's surgery was performed by Dr. Peter Millet M.D., a Non-Preferred Provider in Vail Colorado, with assistance from Dr. Colin G. Looney, M.D., also a Non-Preferred Provider.[28]

Dr. Millet submitted a claim for benefits to Defendant listing five separate CPT codes for "Anterior shoulder capsule and labral reconstruction with tibialis anterior allograft," "Revision capsular shift for MDI," "Biceps tenodesis," "Deep tissue biopsy," and "Scar revision."[29] This claim was then sent to an orthopedic surgery consultant for review.[30] The consultant indicated that the scar revision was incidental to the procedure and no separate benefit should be paid.[31]

Defendant then applied the "Prevailing Charge" provisions applicable to Non-Network Providers, as well as the multiple surgical procedure provision, to Dr. Millet's claim and reduced the benefits payable accordingly.[32] After these reductions, Defendant deducted Plaintiff's remaining unpaid Non-Network Provider deductible from the total Covered Charges and calculated the total benefit payable to Dr. Millet to be 60% of that remaining total, as is provided in the Policy for

---

[27]PLI/Mock 00002; *see also* 000154.

[28]*See, e.g., id.* at 000119.

[29]*Id.* at 75. *See generally U.S. v. Custodio*, 39 F.3d 1121, 1123 n.4 (10th Cir.1994) ("*The Physicians Current Procedural Terminology Book*, called the CPT, is the standard system for coding procedures performed by health care providers")

[30]*Id.* at 75, 129-39.

[31]*Id.*

[32]*Id.* at 000114, 000632.

7

services rendered by Non-Network Providers.[33] Similarly, the policy provision regarding surgery assistants was applied to the claim for Dr. Looney's services, and that claim was reduced to 20% of the Prevailing Charges of the procedure, resulting in a Covered Charge of $434.33.[34] Applying the deductible requirement to this charge precluded any benefit for this claim.[35]

On or about May 30, 2007, Plaintiff sought assistance in disputing Defendant's determination from the Oklahoma Department of Insurance (DOI).[36] In response to Plaintiff's DOI complaint, Defendant obtained independent review of Plaintiff's claim by Marc Appel, M.D., a board certified orthopedic surgeon.[37] Upon review of Dr. Millet's operative report, Dr. Appel concluded that Dr. Millet's largest charge, for the anterior shoulder capsule and labral reconstruction with tibialis anterior allograft, was not applicable to the procedure performed.[38] Rather he concluded the procedure consisted of a revision capsular shift for MDI and a biceps tenodesis, which was extensive and complex beyond a standard capsulorrhaphy and 15% should be allowed over and above the allowance for the billed CPT codes.[39]

Defendant compared a calculation of the benefits using Dr. Appel's analysis to one using the analysis performed by the initial consultant and determined that it had actually paid a higher

---

[33]*Id.* at 000115, 000634-635.

[34]*Id.*

[35]*Id.*

[36]*Id.* at 516.

[37]*Id.* at 000147-150, 000291-293.

[38]*Id.*

[39]*Id.*

8

benefit than would be available using the independent analysis of Dr. Appel.[40] Based on Dr. Appel's independent analysis, Defendant determined that no further benefit was payable.[41] After the review, Defendant explained by letter that it believed it had provided benefits for Covered Charges in accordance with the terms of the policy, and no further benefits would be paid.[42] The letter, dated August 31, 2007, also briefly explained the cost-based methodology used in reviewing Plaintiff's claim.[43]

On September 29, 2008, Plaintiff, through counsel, sought further explanation of Defendant's methodology.[44] Defendant responded by letter dated November 26, 2008, fully explaining its rationale, including a detailed explanation of the cost-based methodology used to calculate Prevailing Charges, the Resource-Based Relative Value Scale (RBVRS) used by Medicare.[45] Plaintiff, through counsel, appealed again by letter dated December 19, 2008.[46] By letter dated February 19, 2009, Defendant again responded to and rejected Plaintiff's arguments.[47]

## C. Procedural History

Plaintiff chose to pursue litigation by filing a Complaint against Principal Life Insurance

---

[40]*Id.* at 000116, 000588-590.

[41]*Id.* at 000116.

[42]*Id.* at 192.

[43]*Id.*

[44]*Id.* at 194-95.

[45]*Id.* at 246-47.

[46]*Id.* at 000726-62

[47]*Id.* at 000116.

Company December 29, 2008.[48] The Court has previously rejected Plaintiff's entreaties to modify the standard of review and to rearrange the order of documents in the Administrative Record.[49] The case was fully briefed pursuant to an ERISA schedule.[50]

**DISCUSSION**

**A. Standard of Review**

Here, it is uncontested that the language of the plan clearly gives the administrator authority to determine eligibility benefits and construe the terms of the plan.[51] The law is quite clear on this point: "If the plan grants discretionary authority to the administrator or fiduciary, the exercise of that authority will be set aside only if it is arbitrary or capricious."[52]

However, in her Opening Brief, Plaintiff re-urges a previously denied motion that a *de novo* standard of review is appropriate in this case.[53] In her initial argument, Plaintiff contended that an inherent conflict of interest dictated less deferential review.[54] The Court rejected this, citing changes in Circuit law have held conflicts do not necessitate a change in the standard of review.[55] Rather, the

---

[48]Docket No. 2.

[49]Docket No. 40.

[50]*See* Docket No.'s 44, 45, 48, 49, 50, 51.

[51]PLI/Mock at 000352-353.

[52]*Nance v. Sun Life Assurance Co. of Canada*, 294 F.3d 1263, 1267-68 (10th Cir.2002) (*citing Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir.1996)).

[53]*See* Plaintiff's Opening Brief at 16.

[54]*See* Opinion and Order at 3-4, Docket No. 40.

[55]*Id.* at 4.

existence of a conflict is merely a factor the Court should consider in its analysis.[56] Now Plaintiff offers new case law, arguing that a change in standard of review may be warranted because the record shows the existence of "serious procedural irregularities."[57]

In *Kellog v. Metropolitan Life Insurance Company*, the Tenth Circuit found procedural irregularity warranting less deferential review where the plan administrator failed to exercise his discretion within the ERISA time limits, and the plaintiff's claim was therefore "deemed denied."[58] In *LaAsmar v. Phelps Dodge Corporation Life, Accidental Death & Dismemberment and Dependent Life Insurance Plan*, the Circuit imposed *de novo* review when administrative review was done (1) in a belated manner, (2) outside ERISA mandated time limits, and (3) where administrator failed to offer a reasoned evaluation of evidence submitted to satisfy initial objections.[59] These cases offer instances where a change in standard of review may be proper. However, to alter the standard of review, alleged procedural irregularities must be "serious," as the Circuit has held that the standard of review should not change if the plan administrator in question was in "substantial compliance" with ERISA's regulatory requirements.[60]

Plaintiff argues vehemently for the existence of serious procedural irregularity warranting

---

[56] *Id.* (*citing Holcomb v. Unum Life Ins. Co. of America*, 578 F.3d 1187, 1192-93 (10th Cir.2009)

[57] *See* Plaintiff's Opening Brief at 16.

[58] 549 F.3rd 818, 825 (10th Cir. 2008). Plaintiff's citation to *Hancock v. Metropolitan Life Insurance Company,* 590 F.3d 1141, 1152 (10th Cir.2009), is unhelpful, as the Circuit Court repeats the standard, but declines to apply it.

[59] 605 F.3d 789, 796-97 (10th Cir.2010).

[60] *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635(10th Cir.2003).

11

application of the *de novo* standard, even resorting to near-personal attacks on opposing counsel.[61] However, Plaintiff's Opening Brief arguments point to no specific ERISA statutory procedure that has been violated. Plaintiff does raise, in her Response brief, that Defendant failed to provide adequate information regarding the processing and determination of her claim.[62] Plaintiff specifically states that Defendant did not provide information regarding how "Prevailing Charges" were determined until Defendant had been threatened with suit.[63] The Court finds this argument to be without merit.

ERISA procedure requires that an administrator's reason for denial "must be stated in reasonably clear language."[64] As noted above, the Court looks for "substantial compliance" when assessing whether or not an administrator failed to meet this or any other procedural requirement.[65] In determining whether an administrator's action is in "substantial compliance," the Court should consider the purpose of the procedural requirement.[66]

The administrative record clearly shows that Defendant explained the basic components of

---

[61]*See* Plaintiff's Reply to Principal Life Insurance Company's Response in Support of Denial of Claim Under ERISA at 10, Docket No. 51 ("However, for Principal to argue that it is okay to engage in serious procedural irregularities and still get the benefit of the arbitrary-and-capricious standard of review as long as it does not altogether fail to render a decision on the claim, *is asinine*") (*emphasis added*).

[62]Plaintiff's Response to Principal Life Insurance Company's Brief in Support of Denial of Claim Under ERISA at 18, Docket No. 49.

[63]*See id.*

[64]*Gilbertson*, 328 F.3d at 635 (*citing Booton v. Lockheed Medical Benefit Plan,* 110 F.3d 1461, 1463 (9th Cir.1997).

[65]*Id.* at 634-35.

[66]*See id.* at 635.

the RBRVS methodology in the August 31, 2007 response following Plaintiff's DOI inquiry.[67] This was nearly a month before counsel's involvement.[68] The August 31, 2007 letter gave a reasonably clear explanation of the decision-making process. In fact, the detailed explanation of the RBRVS methodology produced in response to counsel's request is arguably much less "clear" than the August, 31, 2007 explanation given to Plaintiff.[69]

The intent of the requirement at issue is very clearly to provide a claimant with enough information to understand and challenge a claim denial. Defendant's August 31, 2007 letter provided that information, going beyond the "substantial compliance" required, and complying fully with ERISA procedure. As such, there is no procedural irregularity that warrants a shift in the standard of review. Plaintiff's second request for a less deferential standard of review is **DENIED**.

## B. Defendant's Review of Plaintiff's Claims

Under the arbitrary and capricious standard, the Court's inquiry is limited to determining whether Principal's interpretation of the ambiguous language was "reasonable and made in good faith."[70] The Court will not substitute its own judgment for that of the plan administrator unless the administrator's actions are without any reasonable basis.[71] The Court recognizes that the instant Defendant both determines and pays benefits, creating an inherent conflict of interest in this case.

---

[67] PLI/Mock at 000192.

[68] *See* PLI/Mock at 194-95 (counsel's first request for information).

[69] *See id.* 246-47.

[70] *Geddes v. United Staffing Alliance Employee Medical Plan*, 469 F.3d 919, 929 (10th Cir.2006) (*internal citations omitted*).

[71] *Id.*

The Court weighs that conflict accordingly in its analysis.[72]

1. Determination of Dr. Millet's and Dr. Looney's Provider Status

It is uncontested that Doctors Millett and Looney were "Non-Network Providers" under the Policy.[73] However, Plaintiff contends that the following Policy language dictates that Doctors Millet and Looney should be reimbursed at the Preferred Provider Rate:

> If Treatment or Service for a listed Covered Charge is not available through a Preferred Provider and you or your Dependent receive such Treatment or Service from a Non-Preferred Provider, that provider shall be reimbursed at the same rate as the Preferred Provider would have been reimbursed had you or your Dependent been treated by a Preferred Provider.

Generally, a plaintiff suing under ERISA bears the burden of proving entitlement to contractual benefits.[74] As Plaintiff here seeks to invoke coverage under the above Policy terms, it is Plaintiff's burden to demonstrate that coverage under these terms exists, i.e. that coverage was unavailable through a Preferred Provider.

To demonstrate the unavailability of a Preferred Provider, Plaintiff offers letters from her treating physicians that stated both that the procedure she received "[wa]s not a procedure that [wa]s done in Tulsa Oklahoma by any of the practicing orthopedic surgeons" and "[t]here are few surgeons who perform this type of shoulder reconstruction."[75] These letters may demonstrate the unavailability of a local or in-state physician who could perform the necessary procedure, however

---

[72]*See Holcomb v. Unum Life Ins. Co. of America*, 578 F.3d 1187, 1192-93 (10th Cir.2009) (embracing a combination-of-factors method of review).

[73]Plaintiff's Opening Brief at 22, Docket No. 45.

[74]*Pitman v. Blue Cross and Blue Shield of Oklahoma*, 217 F.3d 1291, 1298 (10th Cir.2000).

[75]Plaintiff's Opening Brief at 17, Docket No. 45.

14

they do not provide any evidence that there were no physicians in the Policy's nationwide Preferred Provider network who could perform the admittedly specialized procedure.

Plaintiff was aware, as of her mother's December 27, 2006 telephone call to Defendant's representative, that Dr. Millet was a Non-Preferred Provider. Plaintiff offers no evidence that, subsequent to this call, she even inquired about a Preferred Provider who could perform the procedure. Instead, she elected to go with the Non-Preferred Provider recommended by Dr. Fox, ostensibly on the basis of promises allegedly made by the representative that Plaintiff's "maximum out-of-pocket cost would be $10,000.00."[76] As Plaintiff has failed to show that a Preferred Provider was unavailable, Plaintiff fails to show the applicability of the Policy language cited. As a result, the Court finds Defendant acted reasonably under the terms of the policy. Regardless of any conflict of interest, Defendant was not arbitrary and capricious in its determination that Doctors Millet and Looney were Non-Network Providers and not eligible for Preferred Provider treatment under the above-cited language.

2. Calculation of the "Prevailing Charge"

Plaintiff's total claims related to the surgery exceed $50,000.[77] Plaintiff does not concede that any of her claims were handled correctly but singles out for demonstrative purposes claims for the services of Dr. Millet and Dr. Looney totaling $25,937.80, in which Principal disallowed $23,064.03 as non-Covered Charges.[78] The bulk of Dr. Millet's claims were not "Covered Charges" because

---

[76]*Id.* at 5. The Court notes that even if such allegations were true, the oral representations do not alter the terms of the Policy. *See Miller v. Coastal Corp.*, 978 F.2d 622, 624 (10th Cir.1992).

[77]Plaintiff's Opening Brief at 5, Docket No. 45

[78]*Id.*

Defendant determined the charges were in excess of the "Prevailing Charges" billed by other doctors in the region for the same or similar procedures. Plaintiff contends that Defendant's calculation of the "Prevailing Charges" in this case was arbitrary and capricious.[79]

The Policy language defines "Covered Charges" as "the actual cost charged to the Member or Dependant but only to the extent that the actual cost charged does not exceed Prevailing Charges."[80] In order to calculate "Prevailing Charges" for Non-Preferred Providers with whom Defendant has no contract, the Policy uses "a cost-based methodology used by Medicare or a methodology similar to one used by Medicare."[81] Defendant clarified to Plaintiff in its appeal denial letters that the methodology was in fact the Resource-Based Relative Value Scale used by Medicare.[82]

Plaintiff argues that Defendant's determination of "Prevailing Charges" under the plan is similar to the administrator interpretation in *Geddes v. United Staffing Alliance Employee Medical Plan.*[83] In *Geddes*, the Tenth Circuit held an insurer's interpretation of "usual and customary" was arbitrary and capricious because the insurer declared the "usual and customary rate" for "out-of-network providers" was the same as the average for "in-network providers" with whom the insurer had negotiated reduced rates.[84]

---

[79] *See id.* at 11.

[80] PLI/Mock at 000399.

[81] *Id.* at 000344-45.

[82] *Id.* at 247.

[83] Plaintiff's Response to Principal Life Insurance Company's Brief in Support of Denial of Claim Under ERISA at 14-15, Docket No. 49.

[84] *Geddes,* 469 F.3d at 930-31.

16

The Circuit found "that interpreting a 'customary' charge in the medical market as synonymous with the discounted rate negotiated by a health plan with its preferred providers is a significant deviation from industry custom."[85] Such "industry customs" are reasonable external standards by which to evaluate an insurer's interpretation of plan language, and an administrator who contravenes such customs is guilty of an abuse of discretion.[86]

Here, the Defendant Administrator uses the RBVRS methodology used by Medicare to guide its "Prevailing Charges" determination.[87] By tying its "Prevailing Charges" calculus to the Medicare methodology, Defendant applies an industry standard to make its determination. This industry standard uses the rate schedule surveys and equations that the Circuit found lacking in *Geddes*.[88]

This use of nationally recognized industry standards for determining the prevailing cost of medical service distinguishes the instant case from *Geddes* and works to defeat any conflict of interest argument. Further, Defendant's determination that Dr. Millet's fees were in excess of the "Prevailing Charges" and therefore not "Covered Charges," was solely based on accepted governmental research, and thus was neither arbitrary nor capricious in light of the *Geddes* rationale.[89] In addition, Defendant's refusal to apply these Non-Covered Charges to Plaintiff's

---

[85]*Id.*

[86]*Id.* at 929-930.

[87]Brief of Defendant Principal Life Insurance Company in Support of Denial of Claim Under ERISA at 14, Docket No. 44.

[88]*See* PLI/Mock at 247. *See Geddes,* 469 F.3d at 930 (administrators typically rely on rate schedules assembled from surveys, Defendants made no such surveys).

[89]*See Geddes,* 469 F.3d at 930 (finding administrator had no standard, and arbitrarily applied rate based on contractual negotiations with network providers).

yearly out-of-pocket expense requirements is clearly within the terms of the Policy and does not constitute unreasonable, arbitrary, or capricious conduct.

3. Determination that Surgery Consisted of Multiple Procedures

Finally, Plaintiff argues that Defendant's processing of Plaintiff's shoulder surgery as multiple procedures, and reducing benefits accordingly, was arbitrary and capricious.[90] The relevant policy language provides:

> If You or one of your Dependents undergo two or more procedures during the same anesthesia period, Covered Charges for the services of a Physician, facility or other covered provider for each procedure that is clearly identified and defined as a separate procedure will be based on:
>
> 100% of Prevailing Charges for the first or primary procedure; and
>
> 50% of Prevailing Charges for the second procedure; and
>
> 25% of Prevailing Charges for each of the other procedures.[91]

Plaintiff contends, and Dr. Millet's statement supports, that the complex surgery she received (1) consisted of component parts of a single procedure, (2) defied existing CPT coding, and (3) required the use of multiple codes to approximate the treatment received.[92]

Other evidence, however, points to the reasonableness of Defendant's determination that multiple procedures were performed. In its review of Plaintiff's claim, Defendant procured detailed claim reviews from two orthopedic specialists. By Plaintiff's own admission, such "[c]onsultants

---

[90] Plaintiff's Opening Brief at 23, Docket No. 45.

[91] PLI/Mock 000401.

[92] Plaintiff's Opening Brief at 23; PLI/Mock 000083.

are retained to help determine the proper CPT codes and the like."[93] Defendant's first consultant reviewed Millet's procedure and eliminated one of the claimed component procedures, scar revision, as being incidental to the procedure.[94] The independent review by Dr. Appel eliminated another of the component CPT codes claimed by Dr. Millet.[95] Dr. Appel also stated that "a physician would be required to assist with *each procedure* performed on 01/03/07."[96]

Both of these consultants offered a detailed review of Dr. Millet's treatment. However, neither of the consultants reflected Dr. Millet's assertion that the procedure performed was so complex as to defy existing CPT codes. Rather, Defendant's consultants, without reservation, rendered their opinions of Dr. Millet's treatment of Plaintiff in terms of multiple procedures as defined by existing CPT coding. Further, the independent review by Dr. Appel clearly indicated that the Plaintiff's surgery on January 3, 2007 consisted of multiple procedures, rather than a single one.[97]

Dr. Millet's use of multiple CPT codes defining his treatment, combined with the subsequent consultant opinions, provides Defendant a reasonable basis upon which to base its determination that Plaintiff underwent multiple procedures under the same anesthesia.[98] Although the Court may

---

[93]Plaintiff's Response to Principal Life Insurance Company's Brief in Support of Denial of Claim Under ERISA at 19, Docket No. 49.

[94]PLI/Mock 000075, 000129-139.

[95]*Id.* 000148.

[96]*Id.*(*emphasis added*).

[97]*Id.*

[98]*Cf. Rademacher v. Colorado Ass'n of Soil Conservation Districts Medical Ben. Plan*, 11 F.3d 1567, 1570 (10th Cir. 1993) ("We recognize that even a single birth may involve multiple procedures for which the Plan would provide coverage").

question this finding, it cannot substitute its own judgment for that of the plan administrator unless the administrator's actions are without any reasonable basis.[99] As Defendant had a reasonable basis, the Court finds Defendant's application of the Policy's multiple procedure terms was not arbitrary and capricious.

## CONCLUSION

For the reasons cited herein, Defendant Principal's determination of benefits payable to Plaintiff Mock is hereby AFFIRMED. A separate Judgment is filed herewith.

IT IS SO ORDERED this 30th day of January, 2012.

*[signature]*
James H. Payne
United States District Judge
Northern District of Oklahoma

---

[99] *Geddes*, 469 F.3d at 929 (*internal citations omitted*).